UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

_____

| | | |
|---|---|---|
| Robert Vozzella, Personal Representative | ) | |
| of the Estate of Judith Vozzella, and | ) | |
| Robert Vozzella, in his individual | ) | |
| Capacity | ) | |
| | ) | |
| Plaintiff | ) | JURY TRIAL DEMANDED |
| | ) | 1:11-cv-00175-PB |
| v. | ) | |
| | ) | |
| HCA Health Services of New Hampshire, Inc., | ) | |
| d/b/a Portsmouth Regional Hospital, | ) | |
| and | ) | |
| Appledore Medical Group II, Inc., d/b/a | ) | |
|  Coastal Cardiothoracic & Vascular Assoc. | ) | |
| | ) | |
| Defendants | ) | |

_____ )

**FIRST AMENDED COMPLAINT**

The Plaintiffs bring this action for medical injury and wrongful death pursuant to RSA 507-E and RSA 556:12 against Defendants.

**PARTIES**

1.    At all relevant times the Plaintiff, Robert Vozzella, was a citizen of the State of Maine, residing at 403 Goodwin Road, Eliot, ME 03903, and is the personal representative of the Estate of Judith Vozzella, having been duly appointed by the York County Probate Court on January 15, 2010.

2.    Judith Vozzella resided at 403 Goodwin Road, Eliot, ME 03903, prior to her death and was a domiciliary of the State of Maine.  Mrs. Vozzella's date of birth was December 15, 1948.

3.    The Plaintiff, Robert Vozzella, is a resident of the State of Maine and lives at 403 Goodwin Road, Eliot, ME 03903.  He is the surviving husband of Judith Vozzella, having been married to her on May 19, 1973.

4.    The Defendant, HCA Health Services of New Hampshire, Inc. d/b/a

Portsmouth Regional Hospital is a private corporation that is incorporated in the State of New Hampshire which does business as Portsmouth Regional Hospital, a hospital located at 333 Borthwick Avenue in Portsmouth, New Hampshire, (hereinafter "Portsmouth Regional Hospital").

5.   At all times relevant herein, Portsmouth Regional Hospital acted by and through its administrators, officers, employees, staff, agents and ostensible agents for the purpose of operating its business as a hospital, medical center and health care provider and is therefore liable for the negligent acts and misconduct of said administrators, officers, employees, staff, agents and ostensible agents under the legal doctrine of vicarious liability.

6.   At all times relevant herein, Portsmouth Regional Hospital extended privileges to health care providers based on a credentialing process and held itself out to members of the general public including Mr. and Mrs. Vozzella as a provider of competent medical care and other health care services in this facility in accordance with the accepted standard of care amongst similar health care providers and as such owed duties to the Vozzellas including but not limited to its duty to: a) protect the members of the general public from foreseeable injury by practicing within the standard of care; b) provide the timely examination, test, and diagnosis of any and all medical conditions reasonably expected or discovered; c) provide appropriate treatment and care of the patient ; and d) provide any other medical services that a reasonably prudent and competent health care provider would administer under the same or similar circumstances.

7.   Defendant, Appledore Medical Group II, Inc.d/b/a Coastal Cardiothoracic and Vascular Associates (hereinafter Appledore) is a corporation registered in New Hampshire with a principal place of business at One Park Plaza, Nashville, TN and operating in New Hampshire at 333 Borthwick Avenue in Portsmouth, New Hampshire, County of Rockingham with a registered agent identified as CT Corporation, 9 Capitol Street, Concord, NH 03301.

8.   At all times relevant herein, Appledore is alleged to have registered the trade name Coastal Cardiothoracic & Vascular Associates and to have employed various care providers including doctors and physicians assistants who provided care to Judith Vozzella at Portsmouth Regional Hospital.

9.   Defendant Appledore acted by and through its administrators, officers, employees, staff, agents and ostensible agents for the purpose of operating

its business as a medical center and health care provider and is therefore liable for the negligent acts and misconduct of said administrators, officers, employees, staff, agents and ostensible agents under the legal doctrine of vicarious liability.

10. At all relevant times, Appledore held itself out to members of the general public including Mr. and Mrs. Vozzella as a provider of competent medical care and other health care services in this facility in accordance with the accepted standard of care amongst similar health care providers and as such owed duties to the Vozzellas including but not limited to its duty to: a) protect the members of the general public from foreseeable injury by practicing within the standard of care; b) provide the timely examination, test, and diagnosis of any and all medical conditions reasonably expected or discovered; c) provide appropriate treatment and care of the patient ; and d) provide any other medical services that a reasonably prudent and competent health care provider would administer under the same or similar circumstances.

## JURISDICTION & VENUE

11. This court has jurisdiction over the parties and the causes of action alleged herein pursuant to 28 USC §1332 due to the diversity of the citizenship of the parties and the amount in controversy which exceeds $75,000.

12. Venue lies in this District pursuant to 28 U.S.C. § 1391 because the claims arose in the District of New Hampshire.

## FACTS

13. Robert Vozzella was married to Judith Vozzella (Judith) who died on June 19, 2009 at age 60.

14. On April 12, 2009 Judith was admitted to the York County Hospital in York, Maine with nausea, vomiting and diarrhea.

15. On April 20, 2009 Judith was transferred to the Portsmouth Regional Hospital in Portsmouth, New Hampshire, with a diagnosis of stroke, i.e., left sided cerebrovascular accident, ("CVA") and myocardial infarction due to septic emboli caused by mitral valve endocarditis with an emergent need for surgical mitral valve replacement.

16. Caregivers at Portsmouth Regional Hospital confirmed that Judith was

not suffering with pressure ulcers on her buttocks or elsewhere upon her admission to Portsmouth Regional Hospital.

17.     Records confirm that Physician's Assistant Mark Sullivan, an Appledore employee who worked under the supervision of Dr. Donato Sisto, also an Appledore employee, undertook a history and physical of Judith on April 20, 2009 and determined the need for a mitral valve replacement surgery that was to be performed on April 21, 2009.

18.     At the time of the history and physical, prior to surgery, Appledore identified that Judith suffered with diabetes, severe peripheral vascular disease and was a smoker,

19.     On April 21, 2009 Dr. Donato Sisto, assisted by Mark Sullivan, PA-C performed mitral valve replacement surgery on Judith, which began at or about 12:47 and was completed at or about 17:38.

20.     Dr. Sisto placed an aortic arterial line through an innominate artery to provide blood pressure readings.

21.     Per the Joint Commission/World Health Organization protocol, a "time out" was performed at 12:45 with the surgical team which included the surgical nurses, Dr. Sisto and PA Mark Sullivan; however the surgical team did not discuss the use of an innominate arterial line or the fact that Judith would not be turned after surgery.

22.     On April 21, 2009, following surgery, Judith was transferred in the operating room from a table onto a stretcher, with the innominate line in place, and was then taken to the Intensive Care Unit of the Portsmouth Regional Hospital.

23.     The circulating nurse from the operating room performing the hand-off was unaware of the innominate arterial line and unaware of any orders with regard to turning Judith thus did not communicate same during the hand off to ICU.

24.     Because of the innominate arterial line, at some point after surgery, Dr. Sisto ordered that Judith was not to be turned as indicated by the April 21, 2009 Physician's Order entry, signed by Defendant Mark Sullivan, PA which states: "Do not turn patient due to innominate arterial line."

25. During the post operative period from April 21, 2009 through April 24, 2009, Judith Vozzella was under the care of providers from Coastal Cardiothoracic & Vascular Associates, including but not limited to Dr. Sisto, Physician Assistants Mark Sullivan, G. Looser, Michael Cinilia, Kim Miller, all of whom were employees of Appledore as well as caregivers from Portsmouth Regional Hospital including but not limited to nurses Peggy Dullinger, Erin Gauthier, Crystal Adams, Barbara Ripley, Richard Cooper, Leonard Mullins, Kathryn Badger, Denise Maclatchy, Pamela Hockhousen, and Courtney Audette

26. No further instructions were given with the no turn order relative to what the order actually required and neither the Appledore doctors and physician's assistants nor the nurses at Portsmouth Regional Hospital discussed the full intent of the order.

27. At the time Dr. Sisto issued the no turn order, he did not consider whether Judith's other health issues such as diabetes, peripheral vascular disease and high blood pressure combined with immobility would put her at risk for developing pressure ulcers.

28. Neither Appledore nor the nurses at Portsmouth Regional Hospital discussed or considered the use of a special, pressure relieving surface in light of the no turn order.

29. In fact, at the time, Dr. Sisto only had a vague understanding of available specialty beds.

30. Multidisciplinary rounds took place on the morning of April 22, 2009 and the wound care coordinator, Erin Gauthier, an employee of Portsmouth Regional Hospital participated in those rounds but failed to communicate any concerns with the no turn order and failed to raise any concerns about the surface/stretcher upon which Judith remained.

31. From April 21, 2009 until April 24, 2009, Judith remained supine and immobile on the stretcher, sedated and unable to advocate for herself.

32. During the post-surgery period from April 21, 2009 to April 24, 2009, nurses conducted Braden Score assessments which continually scored Judith at high risk for development of pressure sores and called for certain interventions including but not limited to repositioning every 2 hours, consideration of pressure relieving surface (if bed or chairbound), and education on pressure ulcers to patient and family.

33.   During that same period, and prior to surgery, there was in place a policy at Portsmouth Regional Hospital titled: Wound Care: Prevention, Treatment, Dressing and Irrigation that outlined a protocol for risk identification, risk reduction of hospital acquired pressure sores  and indicated that a Braden Score of 16 or less should result in wound care coordinator notification and individualized recommendations for the patient including use of a therapeutic surface.

34.   Despite this, nurses and other caregivers at Portsmouth Regional Hospital failed to appropriately communicate the Braden scores of far less than 16, the risks of developing hospital acquired pressure sores or the preventions therefore to Dr. Sisto or other caregivers.

35.   This is so even though Nurse Crystal Adams, who worked the immediate post-surgery overnight shift from April 21, 2009 to April 22, 2009, recognized the no turn order as an "abnormality that deviated from the standard of care".

36.    Furthermore, Dr. Sisto and other Appledore employees who were caring for Judith failed to explain the no turn order and what was or was not allowed for addressing development of pressure sores.

37.   None of the Appledore or Portsmouth Regional Hospital care providers planned for or took any appropriate preventative steps during the immediate post-operative patient transfer or subsequently thereafter  to transfer Judith to an appropriate specialty bed or mattress or to otherwise address  the highly probable occurrence of a "never event", i.e., the development of hospital acquired decubitus ulcers, nor did they communicate such risks and needs to her surgeon or his staff.

38.    Although the records are devoid of details, on April 24, 2009 a massive hospital-acquired Stage IV bilateral decubitus ulcer of the buttocks was discovered on Judith's backside.

39.    At that same time and place, on Friday, April 24, 2009, Appledore employee PA Looser asked for a wound care consultant, Erin Gauthier, R.N., in the nursing department at Portsmouth Regional Hospital to examine Judith to address the worsening ulcers.

40.   Nurse Gauthier had already left for the weekend and did not come in to examine Judith but advised that she should be turned every 2 hours and placed on a rotating bed.

41.     At that time, despite still having the innominate arterial line in place, Dr. Sisto and/or other Appledore care providers indicated that Judith could be turned per protocols for appropriate management.

42.     At or about 16:00 on April 24, 2009, though the innominate arterial line was still in place, for the first time since her surgery, Judith was transferred from the stretcher to a sport/rotating bed and was turned by the nursing staff every 2 hours.

43.     No other wound consult took place until Monday, April 27, 2009.

44.     During the three days from April 21, 2009 to April 24, 2009, Defendants, failed to take any appropriate steps to prevent Judith from developing hospital acquired decubitus ulcers and in fact did not have any appropriate preventative wound care plan in place.

45.     Portsmouth Regional Hospital and Appledore failed to protect Judith Vozzella from the worst possible outcome by not providing preventative measures for skin breakdown as required by the standard of care, including their own policies, for three consecutive days.

46.     Portsmouth Regional Hospital and Appledore caregivers failed to discuss or pursue an alternative plan of care for the prevention of the development of pressure ulcers relating to a sedated post-operative immobile patient with a clinical history of global vascular disease, insulin-dependent Diabetes Mellitus Type II, and a left sided CVA.

47.     Although Judith was identified as incontinent of stool from admission, no rectal tube was used to prevent contamination until April 24, 2009.

48.     On the late evening of April 21, 2009, Nurse Crystal Adams documented that Judith had a bowel movement that required Judith to be cleaned without turning her which she attempted by pushing the mattress down, reaching underneath her and using wipes while an LNA watched the innominate line.

49.     Furthermore, though a rectal tube was used beginning April 24, 2009, the Nursing Department and other medical caretakers at the hospital failed to appropriately secure the tube, which fell out at least three times, resulting in fecal contamination of the ulcer.

50.     On April 28, 2009, a general surgery consult was ordered and surgery was performed on April 29, 2009, five days subsequent to the discovery of the

hospital-acquired decubitus ulcers.

51.   The first debridement of the unstageable decubitus ulcer was attempted on April 30, 2009 and it revealed a Stage IV decubitus ulcer with: necrotic skin and muscle of the buttocks bilaterally; necrotic subcutaneous tissue and muscle with extensive soft tissue loss;  a complete loss of the medial gluteal muscle down to the bone, secondary to the necrosis; and extensive exposure of the sacrum.

52.   On April 20, 2009, at the time of the transfer to Portsmouth Regional Hospital, Judith was known to be an extremely high-risk patient for the development of pressure ulcers with an abnormally low albumin level pre-operatively and a history of a recent previous myocardial infarction and CVA, global peripheral vascular disease and Type II insulin-dependent diabetes.

53.   On admission to Portsmouth Regional Hospital Judith's skin was bilaterally intact on her backside and buttocks.

54.   Aggressive wound care intervention to prevent and treat the hospital-acquired decubitus ulcer was not coordinated and not begun until six days after admission and three days following discovery of the ulcer.

55.   Judith underwent additional debridement surgery on May 20, 2009.

56.   On or about the time of her discharge, doctors indicated that given the extent of her hospital acquired decubitus ulcer, and "the extent of the removal of her gluteus muscles and exposure of bone, the possibility of her ability to walk again was negligible"; that Judith "would likely not even be able to tolerate sitting in a wheelchair"; that Judith  is "essentially bed bound" and that she "continued to have pain problems.  " and would be unable to return home or to her previous level of activity or quality of life.

57.   After approximately two months of unremitting pain and suffering from the hospital acquired decubitus ulcer and necessary treatment therefore, Judith died due to complications from the ulcers.

## COUNT I – MEDICAL MALPRACTICE
## PORTSMOUTH REGIONAL HOSPITAL

58.   Plaintiff repeats and realleges every allegation in paragraphs 1-57 as

though fully set forth herein.

59.     At all relevant times, Defendant Portsmouth Regional Hospital was vicariously liable for the negligent care and treatment provided to Judith by its employees and agents as set forth herein.

60.     At all relevant times, Defendant Portsmouth Regional Hospital had a duty to provide treatment to Judith Vozzella that fell within the standard of care that an ordinary, prudent caregiver would exercise under the same or similar circumstances.

61.     Immobilization and the lack of appropriate interventions in Judith's critical clinical setting created a known risk of developing skin breakdown and ultimately was the direct, proximate and foreseeable cause of the hospital-acquired decubitus ulcer.

62.     There is an absence of documentation covering the three-day post-operative period justifying the arterial line compared with the likely problem of skin breakdown.

63.     Given Judith Vozzella's medical status and the duration of her immobilization on a stretcher, Defendant Portsmouth Regional Hospital knew or should have known that a hospital-acquired serious skin breakdown would occur and in fact did know that she was at high risk for development of pressure ulcers as evidenced by her Braden Score assessments.

64.     Defendant Portsmouth Regional Hospital, through the acts of its employees and agents and failed supervision, breached the standard of care by failing to communicate, develop and/or implement an appropriate plan of care to prevent the development of hospital acquired decubitus ulcers including but not limited to allowing Judith to remain supine and immobilized on an operating room stretcher for days without providing appropriate interventions.

65.     Defendant also breached its duty to provide informed consent, as evidenced by the absence of documentation, neither Judith Vozzella nor her family were informed of the risks associated with immobilization on an operating room stretcher in the clinical setting presented.

66.     The professional negligence by the Defendant is a deviation from the applicable standard of care of health care practitioners in the area, to provide reasonable care and safe treatment to Judith for her medical

problems.

67.     The Defendant breached the standards set forth in their own policy
        relative to wound care and prevention and other recognized standards for
        wound care and prevention including but not limited to standards set
        forth by the World Health Organization Joint Commission.

68.     As the direct, proximate and foreseeable result of the negligence and breach
        of the standards of care aforesaid, Judith Vozzella developed a Stage IV
        hospital-acquired decubitus ulcer of the buttocks bilaterally, sustained
        severe damages, endured unremitting pain and suffering, underwent
        relentless painful surgical procedures and invasive interventions, incurred
        substantial medical bills for treatment and died on June 19, 2009.

## COUNT II – WRONGFUL DEATH
## PORTSMOUTH REGIONAL HOSPITAL

69.     Plaintiff repeats and realleges every allegation in paragraphs 1-68 as
        though fully set forth herein.

70.     As a direct and proximate result of the Defendant's negligent acts and
        omissions and breaches of the standard of care,  Judith Vozzella
        developed a Stage IV hospital-acquired decubitus ulcer of the buttocks
        bilaterally, sustained severe damages, endured unremitting pain and
        suffering, underwent relentless painful surgical procedures and invasive
        interventions, all of which directly and proximately resulted in the
        shortening of the probable duration of her life and her ultimate untimely
        death on June 19, 2009.

71.     Also as the direct, proximate and foreseeable result of Defendant's
        negligence, the Estate of Judith Vozzella incurred substantial medical bills
        for treatment and other reasonable expenses occasioned to her estate
        which contributed to and directly led to her progressive clinical decline,
        physically, mentally, spiritually emotionally, and ultimately her untimely
        death.

72.     Wherefore, the Plaintiff's Estate claims damages allowed by law for the
        mental and physical pain suffered by her in consequence of the injury, the
        reasonable expenses occasioned to her estate by the injury, the shortened
        duration of her life and the resulting loss of enjoyment of life caused by
        the injury, and all other elements of damages that may be recovered under
        RSA 556:12.

## <u>COUNT III – MEDICAL MALPRACTICE</u>
## <u>APPLEDORE</u>

73.     Plaintiff repeats and realleges every allegation in paragraphs 1-72 as though fully set forth herein.

74.     At all relevant times, Defendant Appledore was vicariously liable for the negligent care and treatment provided to Judith by its employees and agents as set forth herein.

75.     At all relevant times, Defendant Appledore had a duty to provide treatment to Judith Vozzella that fell within the standard of care that an ordinary, prudent physician or physician's assistant would exercise under the same or similar circumstances.

76.     Defendant Appledore knew or should have known that the use of an innominate line was not medically justifiable under the circumstances and that the decision to place such a line put Judith Vozzella at unnecessary risk in that it resulted in the "no turn" order.

77.     In addition, even if the innominate line was medically justifiable under the circumstances, Appledore breached the standard of care by failing to communicate, develop and/or implement an appropriate plan of care to prevent the development of hospital acquired decubitus ulcers with the line in, which breach includes but is not limited to allowing Judith to remain supine and immobilized on an operating room stretcher without providing appropriate interventions.

78.     Immobilization and/or the lack of appropriate interventions in this critical clinical setting created a known risk of developing skin breakdown and ultimately was the direct, proximate and foreseeable cause of the hospital-acquired decubitus ulcer.

79.     There is an absence of documentation covering the three-day post-operative period justifying the arterial line compared with the likely problem of skin breakdown.

80.     Given Judith Vozzella's medical status and the duration of her immobilization on a stretcher, Defendant knew or should have known that a hospital-acquired serious skin breakdown would occur and in fact

did know that she was at high risk for development of pressure ulcers as evidenced by her Braden Score assessments.

81.    As set forth above, Defendant Appledore, through the acts of its employees and failed supervision, breached the standard of care by failing in their duty to protect Judith from injury and death by allowing her complete immobilization with the omission of a plan of care for the prevention of the development of decubitus ulcers specific to the immobilized, sedated post-operative patient and by failing to communicate such risks to Judith's care providers so that appropriate interventions could be employed.

82.    The alleged professional negligence by the Defendant Appledore is a deviation from the applicable standard of care of health care practitioners in the area to provide reasonable care and safe treatment to Judith Vozzella for her medical problems.

83.    Defendant also breached its duty to provide informed consent, as evidenced by the absence of documentation, neither Judith Vozzella  nor her family were informed of the risks associated with immobilization on an operating room stretcher in the clinical setting presented.

84.    The professional negligence by the Defendants is a deviation from the applicable standard of care of health care practitioners in the area to provide reasonable care and safe treatment to Judith for her medical problems.

85.    As the direct, proximate and foreseeable result of the negligence and breach of the standards of care aforesaid, Judith Vozzella developed a Stage IV hospital-acquired decubitus ulcer of the buttocks bilaterally, sustained severe damages, endured unremitting pain and suffering, underwent relentless painful surgical procedures and invasive interventions, incurred substantial medical bills for treatment and other expenses and died on June 19, 2009.

## COUNT IV – WRONGFUL DEATH
## APPLEDORE

86.    Plaintiff repeats and realleges every allegation in paragraphs 1-85 as though fully set forth herein.

87.     As a direct and proximate result of the Defendant Appledore's negligent acts and omission and breaches of the standard of care, Judith Vozzella developed a Stage IV hospital-acquired decubitus ulcer of the buttocks bilaterally, sustained severe damages, endured unremitting pain and suffering, underwent relentless painful surgical procedures and invasive interventions, all of which directly and proximately resulted in the shortening of the probable duration of her life and her ultimate untimely death on June 19, 2009.

88.     Also as the direct, proximate and foreseeable result of Defendant's negligence, the Estate of Judith Vozzella incurred substantial medical bills for treatment and other reasonable expenses occasioned to her estate. which contributed to and directly led to her progressive clinical decline, physically, mentally, spiritually emotionally, and ultimately her untimely death.

89.     Wherefore, the Plaintiff's Estate claims damages allowed by law. for the mental and physical pain suffered by her in consequence of the injury, the reasonable expenses occasioned to her estate by the injury, the shortened duration of her life and the resulting loss of enjoyment of life caused by the injury, and all other elements of damages that may be recovered under RSA 556:12.

## COUNT V – LOSS OF CONSORTIUM

90.     Plaintiff repeats and realleges every allegation in paragraphs 1-89 as though fully set forth herein.

91.     Robert Vozzella and Judith Vozzella were married on May 19, 1973 and he is the surviving spouse of Judith Vozzella.

92.     As a result of the negligence and breach aforesaid of all Defendants, Robert Vozzella, husband of Judith Vozzella, has been deprived of the care, comfort, society and companionship of his wife.

93.     Wherefore, the Plaintiff Robert Vozzella claims damages for the loss of his wife's consortium.

WHEREFORE, Robert Vozzella demands judgment against all Defendants in an amount sufficient to fully, fairly and adequately compensate him and the Estate for their injuries and losses plus costs and interest.

Dated at Dover, New Hampshire this 1st day of May 2012.

Respectfully submitted,

Robert Vozzella
By His Attorneys,
Shaheen & Gordon, P.A.


*/S/ Christine M. Craig /S/*
Christine M. Craig, #12842
P.O. Box 977, 140 Washington Street
Dover, NH  03821-0977
(603) 749-5000

G. William Higbee, Esq.
McTeague Higbee
4 Union Park, PO Box 5000
Topsham ME  04086-5000